UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>  c/o United States Attorney<br>  for the District of Columbia<br>  555 4th Street, N.W.<br>  Washington, DC 20530<br><br>             Plaintiff,<br><br>             v.<br><br>CI FILING SYSTEMS, LLC,<br> 8 Vreeland Avenue<br> Totowa, NJ 07512<br><br>             Defendant,<br><br>IFS FILING SYSTEMS, LLC,<br> 11225 West Heather Avenue<br> Milwaukee, WI 53224<br><br>             Defendant,<br><br>PERMCLIP PRODUCTS, CORP.<br> 1130 Military Road<br> Buffalo, NY 14217<br><br>             Defendant,<br><br>THOMAS COREY<br> 1130 Military Road<br> Buffalo, NY 14217<br>             Defendant. | Civ. Action No. 22cv1433 |

## **COMPLAINT**

The United States brings this action against defendants CI Filing Systems LLC ("CI"), IFS Filing Systems LLC ("IFS"), Permclip Products Corp. ("Permclip"), and Thomas Corey

("Corey") (referred to collectively as "Defendants") pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*.

## PARTIES

1. Plaintiff is the United States of America, on behalf of the Government Publishing Office ("GPO"). GPO is an agency of the legislative branch of the United States created by 12 Stat. 117. GPO is responsible for producing, preserving, and distributing official Federal Government publications and information products for Congress, Federal agencies, and the American public.

2. Defendant CI Filing Systems LLC is a New Jersey limited liability company with a mailing address of 8 Vreeland Avenue Totowa, NJ 07512.

3. Defendant IFS Filing Systems LLC is a Wisconsin limited liability company with a mailing address of 11225 West Heather Avenue Milwaukee, WI 53224.

4. Defendant Permclip Products Corp. is a New York corporation with a mailing address of 1130 Military Road Buffalo, NY 14217.

5. Defendant Thomas Corey is the President of CI, IFS, and Permclip with a business address of 1130 Military Road Buffalo, NY 14217. Corey is registered with GPO as the owner of IFS and is authorized to sign bids for IFS.

6. CI, IFS, and Permclip are affiliates. Federal Acquisition Regulation 2.101 provides the following definition: "*Affiliates* means associated business concerns or individuals if, directly or indirectly either one controls or can control the other; or third party controls or can control both." Federal Acquisition Regulation 2.101. Permclip is the parent company that owns CI and IFS. Thomas Corey, President, Permclip Products Corp. assumed the role of President at CI and IFS when Permclip bought them in 2013.

7.  CI and IFS ("Defendant Contractors") are registered as contractors with GPO using separate and distinct Tax Identification Numbers (TIN) and contractor codes. Permclip is not registered as a contractor with the GPO.

## STATUTORY FRAMEWORK OF THE FCA

8.  The False Claims Act, originally enacted in 1863 during the Civil War was substantially amended by the False Claims Amendments Act of 1986, signed into law on October 17, 1986; and by the Fraud Enforcement and Recovery Act of 2009, signed into law on May 20, 2009. Congress' intent was to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees and others who act in furtherance of the purposes of the Act. Congress acted after finding that fraud in federal programs and procurement is pervasive and that the Act, which Congress characterized as the primary tool for combating fraud in government contracting, was in need of modernization.

9.  The FCA provides for the award of treble damages and civil penalties for the knowing submission or knowingly causing the submission of a false or fraudulent claim for payment to the United States Government, or knowingly using a false record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A)–(B). Specifically, the FCA provides that any person who:

>   (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
>   (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
>   is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . ., plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. §§ 3729(a)(1).[1]

10. Under the FCA, the United States does not need to demonstrate proof of specific intent to defraud. Rather the term "knowing" and "knowingly" are defined under the FCA to mean that a person has actual knowledge of the truth or falsity of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1).

**JURISDICTION AND VENUE**

11. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33, and the common law.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345.

13. This Court may exercise personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a), because Defendants entered into the contract in the District of Columbia and transact business in the District of Columbia.

14. Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendants transact business in this District.

---

[1] Pursuant to the Bipartisan Budget Act of 2015, 86 Fed. Reg. 70740-70746, 28 CFR 85.5, the FCA civil penalties were adjusted to a range of $11,803 to $23,607 per false claim for violations occurring after November 2, 2015.

4

## FACTS

### Defendants' Contracts with the Government Publishing Office

15.     Defendant Contractors each entered into separate and multiple contracts with GPO (referred to collectively as "GPO Contracts") to provide office supplies, including folder files with attached document holders, to various government agencies.

16.     Every GPO contract entered into by Defendant Contractors specified, in writing, that subcontracting is not allowed, and that bid collusion is not allowed when bidding on GPO contracts.

17.     All GPO contracts awarded to or bid on by Contractors contained express certifications that the bidder understood those prohibitions, and that they would abide by them.

### The Prohibition of Subcontracting Clause

18.     The prohibition of subcontracting is established by GPO regulation:

> (a) The contractor may make contracts with any other party for the furnishing of any part of the supplies or work called for with the exception that the predominant production function required in the performance of the contract shall not be sub-contracted.  If the predominant production function is other than presswork, it shall be so identified in the specifications.
>
> (b) The term "Presswork" includes, but is not limited to digital imaging, laser, inkjet, and bublejet [sic] printing.

GPO Contract Terms, Solicitation Provisions, Supplemental Specifications, and Contract Clauses, GPO Publication 310.2 (Rev 6-01) Section 6.

19.     The above clause is incorporated by reference into all GPO Contracts.  GPO Printing Procurement Regulation 1.4.10(g).

20.     Presswork was the primary production function of the GPO Contracts.

21.     This prohibition is material to the GPO Contracts and Defendants knew the GPO would not have entered into these contracts, and would have terminated existing contracts, if the

Defendants violated this prohibition.

### Defendants Violated the Express Prohibition Against Subcontracting

22. In May 2014, the GPO discovered that CI and Permclip had subcontracted the production of presswork in violation of the prohibition against subcontracting. In response to a GPO-issued Notice of Show Cause (to terminate all contracting with CI and Permclip) CI and Permclip, through legal counsel, informed GPO that it was their believe that subcontracting between affiliated companies was not prohibited under the GPO contract clause.

23. On May 27, 2014, GPO responded by notifying CI and Permlip that their belief was mistaken, and that subcontrating, even among affiliated entities such as CI and Permclip, was prohibited under the clause. CI and Permclip were specifically and directly informed that "GPO will not allow this type of action to continue moving forward, and will insist on performance that follows our Printing Procurement Regulations and GPO Contract Terms. Submissions of quotes or bids must be made with the clear intent that all predominant production functions will be done at the facility indicated with the submission from that firm."

24. Despite this direct and specific warning, Defendants Thomas Corey and Permclip employees directed the Defendant Contractors (CI and IFS) to subcontract work to one-another and to bid collusively in violation of the GPO Contracts.

25. This strategy was intentionally undertaken and managed by Defendant Corey who knew doing so was a violation of the prohibitions against subcontracting and bid collusion.

26. Defendant Corey established regular morning meetings where Defendants and their employees discussed pricing strategy before submitting bids, and further discussed which of the Defendant Contractors had production capacity to satisfy GPO Contracts.

27. Defendant Corey would decide which Defendant Contractor would submit the lowest bid, and how the contracted work would be performed or subcontracted for completion.

28. The employees of the Defendants conducting the regular morning meetings worked out of Permclip's headquarters in Buffalo, New York.

### Examples of the Violation of the Prohibition of Subcontracting

29. As demonstrated below Defendants violated the prohibition of subcontracting which harmed the GPO and the government agencies that received the office supplies. These are only examples and do not represent the extent of wrongdoing.

30. On October 09, 2015, Thomas Corey, President, Permclip Products Corp, and Trey Roth, Sales Director, Permclip, received an email from Brian Kretschmann ("Kretschmann"), Bid Specialist, IFS, communicating the award of a GPO contract to IFS. Kretschmann informed Twayla Bellmunt ("Bellmunt"), Bid Specialist, CI, that if the GPO called in reference to the CI bid that Bellmunt should call Brian right away, that the bid is correct, and that "we" can deliver by the scheduled delivery date.

31. On September 18, 2015, Kretschmann sent an email to Thomas Babcock ("Babcock") Customer Service Representative, CI, and Brian Smith ("Smith") Bid Specialist, CI, stating that if a particular GPO contract was awarded to CI, the goods would be made by IFS and that GPO would not be informed of this fact.

32. On August 03, 2015, Kretschmann sent an email stating that if a particular GPO contract was awarded to CI, the goods would be produced by IFS.

33. On June 19, 2015, Kretschmann sent an email to Babcock and Smith stating that IFS intended to subcontract for CI, if CI was awarded a particular GPO contract. Kretschmann anticipated that IFS would be disqualified from bidding because IFS is a quality level 4 supplier

and the contract required superior quality level 3 goods, which CI qualified for.

34. On May 30, 2018, Corey stated that he knew of an instance where a contract awarded to either CI or IFS was performed by the non-awarded company.

35. On May 30, 2018, Michael Hoag, Operations Manager, Permclip Products Corp. stated that he knew of an instance where IFS performed work on a contract awarded to CI.

36. On September 19, 2017, Babcock stated that CI produced goods for IFS and shipped them to customers. These orders were labelled as if they originated from IFS.

37. On September 18, 2017, Twayla Bellmunt, stated that CI would occasionally produce and ship orders for GPO Contracts awarded to IFS.

38. On June 19, 2017, Brian Kretschmann stated that on occasion a contract awarded to IFS or CI would be worked on or produced by the non-awarded company.

39. Contractors, independent of one-another, certified that they understood the prohibition against subcontracting and certified that they would comply with this prohibition in every individual GPO contract.

40. Defendants knowingly violated the prohibition against subcontracting, and defrauded the government by concealing their subcontracting, as set forth in paragraphs 24-38.

41. GPO would not have entered into any contact with Defendants had it known that Defendants were continuing to subcontract work to Defendant entities.

42. Defendants submitted or caused to be submitted invoices to the GPO for payment under the GPO Contracts, despite Defendants' knowledge that they were in violation of the prohibition of subcontracting.

### The Prohibition of Bid Collusion Clause

43. The prohibition of bid collusion is established by GPO regulation:

> (c) Noncollusive bids.  By submission of a bid, the bidder in the "Certification of Independent Price Determination" on the reverse of the bid form, certifies that among other things:
>
> (1) the prices have been arrived at independently without reference to or agreement with other bidders or with any competitor for the purpose of restricting competition;
>
> (2) the prices bid have not been, and will not be, knowingly disclosed, and no attempts have been made to induce any other firm to submit or not to submit a bid;
>
> (3) the signer of the bid is the one responsible for the decision as to the prices bid, and, has not and will not participate in any conduct contrary to (1) or (2) above.

GPO Printing Procurement Regulation 1.4.2(c).

44. This clause applies to all bids submitted for GPO contracts.

45. This prohibition is material to the GPO Contracts and Defendants knew the GPO would not have entered into these contracts, and would have terminated existing contracts, if the Defendants violated this prohibition.

### Examples of the Violation of the Prohibition of Bid Collusion

46. As demonstrated below Defendants violated the prohibition of bid collusion harming the GPO and the government agencies which received the office supplies.  These are only samples and not the extent of wrongdoing.

47. On May 30, 2018, Thomas Corey, President, Permclip Products Corp. stated that after Permclip purchased CI and IFS in 2013, Corey directed an effort to bid on every GPO job that either CI or IFS could complete.  Corey instituted morning conference calls with employees of CI, IFS, and Permclip and directed them to examine the prices of all bids.

9

48.     On September 19, 2017, Babcock stated that he was present in meetings where IFS personnel discussed prices for their GPO contract bids with Permclip employees. Babcock also stated that IFS personnel were present in meetings where he discussed CI pricing for GPO contract bids. Babcock stated Permclip reserved the right to change his bids and did instruct him to change bid prices on occasion. Babcock forwarded all GPO bid confirmations to Permclip.

49.     In the same interview, Babcock stated that Permclip created a pricing model for CI and another for IFS. The Contractors used these Permclip pricing models to construct bids for GPO contracts. Before this interview GPO OIG Special Agents witnessed a receptionist answering the CI office phone as both CI and Permclip.

50.     On September 18, 2017, Twayla Bellmunt, Bid Specialist, CI, stated that though she was designated as CI's GPO representative, she never determined the price that CI would bid for GPO contracts. Kretschmann of IFS calculated the price for both CI and IFS bids for GPO contracts and informed Bellmunt what price to bid for CI. Bellmunt often spoke with Kretschmann about whether CI or IFS would be the low bidder for GPO contracts.

51.     During the same interview, Bellmunt stated that CI, IFS, and Permclip operate as a single company under the direction of Corey with shared management and a centralized phone system.

52.     As of July 14, 2017, Bellmunt was listed as an authorized bidder for CI, despite Bellmunt ending employment with CI in 2015.

53.     On December 07, 2016, Thomas Corey received an email from Trey Roth, Sales Director, Permclip, communicating the award of a GPO contract to CI. The message confirms that CI and IFS bid on the same contract as a collusive bid strategy. The message confirms that IFS was the low bidder but was presumed by Roth to be excluded because they were on GPO's

"blacklist" at the time.

54. On June 09, 2016, Babcock sent an email to Kretschmann, asking what price CI should bid for a GPO quote. On June 10, 2016 Babcock also asked what price IFS quoted for the same GPO contract.

55. On June 10, 2016, Kretschmann sent an email to Corey communicating bid pricing information for quotes sent in response to the same GPO contract from both CI and IFS.

56. On October 09, 2015, Corey and Trey Roth, Sales Director, Permclip, received an email from Kretschmann revealing that CI and IFS both bid on the same GPO contract. Kretschmann stated that Corey directed IFS to include a 2% discount in the quote. Kretschmann used the details of the CI bid to construct the IFS bid revision.

57. On September 18, 2015, Kretschmann sent an email to CI Bid Specialists Babcock and Smith stating that Kretschmann placed bids for a GPO contract from CI and IFS. A screenshot was included revealing that the bid from CI was sent under the contact name of Twayla Bellmunt, while the IFS bid was submitted under the contact name Brian Kretschmann. This is the same email discussed in paragraph 29.

58. On August 03, 2015, Kretschmann sent an email stating that he placed bids for a GPO contract from both CI and IFS. This is the same email discussed in paragraph 30.

59. On June 19, 2015, Corey received an email in which Kretschmann explained the cooperative bid strategy for a GPO contract to Babcock and Smith. Kretschmann stated the CI bid is a "hedge" in case IFS is disqualified from bidding. This is the same email discussed in paragraph 31.

60. On June 18, 2015, Kretschmann sent an email to Babcock and Smith informing them CI and IFS needed to discuss price before placing bids for a particular GPO contract. On

June 19, 2015 Smith replied stating that Smith understood that Kretschmann had spoken to "Tom" (presumed to be Babcock) about pricing.

61. CI and IFS both submitted bids for the same GPO contract at least 103 times between January 5, 2015, and January 5, 2017.

62. Upon discovering that Defendants were involved in bid collusion, GPO immediately initiated suspension and debarment proceedings against Defendants and specified Defendant employees.

63. Contractors, independent of one-another, certified that they understood the prohibition against bid collusion and certified that they would comply with this prohibition in every individual GPO contract.

64. Defendants knowingly violated the prohibition against bid collusion as represented by paragraphs 43-45. As a matter of course spanning three companies, Defendants strategically and consistently violated the prohibition against bid collusion.

65. GPO would not have entered into any contact with any of the Defendants had it known that Defendants were violating the prohibition against bid collusion.

66. Defendants submitted or caused to be submitted invoices to the GPO for payment under the GPO Contracts, despite Defendants' knowledge that they were in violation of the prohibition against bid collusion.

**DAMAGES**

67. Between 2015 and 2017, CI submitted 93 invoices for payment under GPO Contracts and GPO paid $403,219.24 to CI. Defendants submitted or caused to be submitted to the GPO these invoices, despite Defendants' knowledge that they were violating the prohibition of subcontracting and bid collusion.

68. Between 2013 and 2017, IFS submitted 141 invoices for payment under GPO Contracts and GPO paid $1,666,273.82 to IFS. Defendants submitted or caused to be submitted to the GPO these invoices, despite Defendants' knowledge that they were violating the prohibition of subcontracting and bid collusion.

## FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(A))

69. The United States incorporates each allegation in Paragraphs 1 through 69 as if fully set forth herein.

70. Defendants knowingly (as "knowingly" is defined by 3l U.S.C. § 3729(b)(1)) presented or caused to be presented actual or implied false or fraudulent claims for payment or approval to the United States. Specifically, Defendants billed the GPO, and the United States paid for, office supplies from a source that abided by the prohibitions of subcontracting and bid collusion. Defendants certified that they understood and abided by the prohibitions of subcontracting and bid collusion, though Defendants knew that to be false.

71. By virtue of the false or fraudulent claims made by Defendants, the United States suffered damages in an amount to be determined at trial and therefore is entitled under the False Claims Act to triple damages. The United States is also entitled to a civil penalty of $11,803 to $23,607 for each violation that occurred on or after November 2, 2015, and $5,500 to $11,000 for each violation that occurred on or before November 1, 2015.

## SECOND CAUSE OF ACTION
(False Claims Act: Making or Using False Record or Statement)
(31 U.S.C. § 3729(a)(1)(B))

72. The United States incorporates each allegation in Paragraphs 1 through 69 as if fully set forth herein.

73. Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. Specifically, Defendants knowingly made false statements and/or implied certifications to the GPO that Defendants abided by the prohibitions of subcontracting and bid collusion. Defendants failed to notify or inform the GPO that Defendants violated the prohibitions of subcontracting and bid collusion.

74. By virtue of the false or fraudulent claims or certifications made by Defendants, the United States suffered damages in an amount to be determined at trial and therefore is entitled under the False Claims Act to triple damages. The United States is also entitled to a civil penalty of $11,803 to $23,607 for each violation that occurred on or after November 2, 2015, and $5,500 to $11,000 for each violation that occurred on or before November 1, 2015.

### THIRD CAUSE OF ACTION
(Breach of Contract)

75. The United States incorporates each allegation in Paragraphs 1 through 69 as if fully set forth herein.

76. By reason of the actions described above, Defendants breached the GPO Contracts by failing to abide by the prohibitions of subcontracting and bid collusion.

77. As the result of this breach of contract, the United States has sustained damages.

### FOURTH CAUSE OF ACTION
(Unjust Enrichment)

78. The United States incorporates each allegation in Paragraphs 1 through 69 as if fully set forth herein.

79. Defendants obtained payments from the GPO by submitting invoices to the GPO under contracts that the Defendants knew they were breaching. Defendants knowingly engaged

in subcontracting and bid collusion in violation of prohibitions against subcontracting and bid collusion. As a result of these payments, Defendants have been unjustly enriched at the expense of the United States, under circumstances dictating that in equity and good conscience sums paid to Defendants should be returned.

### FIFTH CAUSE OF ACTION
(Fraud-in-the-Inducement under the False Claims Act)

80. The United States incorporates each allegation in Paragraphs 1 through 69 as if fully set forth herein.

81. Defendants qualified for the award of GPO Contracts by independently certifying that they understood and abided by the prohibitions of subcontracting and bid collusion. Defendants did not intend to abide by the prohibitions of subcontracting and bid collusion. Defendants did not in fact abide by the prohibitions of subcontracting and bid collusion. If the GPO contracting office knew that the Defendants did not intend to abide by the prohibitions of subcontracting and bid collusion, or that the Defendants did not in fact abide by the prohibitions of subcontracting and bid collusion, then the GPO contracting office would have disqualified the Defendants from bidding on GPO contracts.

82. When a U.S. government contract is entered into as a result of fraud-in-the-inducement through collusive bidding every subsequent claim for payment against that contract is subject to FCA liability.[2]

83. Defendants obtained GPO contracts by falsely certifying that they understood and intended to abide by the prohibitions against subcontracting and bid collusion. Without this false

---

[2] *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542-44 (1943); *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999).

certification the GPO contracting office would not have awarded GPO contracts to Defendants. All payments made to Defendants on GPO Contracts that were awarded due to these false certifications are subject to FCA liability.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

84. On Plaintiff's Counts One and Two, False Claims Act, judgment against the Defendants, for treble its damages and, for the number of civil penalties allowable by law, in an amount as the Court may determine between of $11,803 to $23,607 for each violation that occurred on or after November 2, 2015, and $5,500 to $11,000 for each violation that occurred before November 1, 2015;

    A. On Plaintiff's Count Three, Breach of Contract, for damages together with costs and interest;

    B. On Plaintiff's Count Four, Unjust Enrichment, for damages together with costs and interest;

    C. On Plaintiff's Count Five, Fraud-in-the-Inducement under the False Claims Act, for the full amount paid to Defendants under the GPO Contracts awarded to Defendants as a result of false certifications, together with civil penalties, costs, and interest;

    D. For all other and further relief as the Court may deem just and equitable;

    E. For pre-judgment interest, post-judgment interest, fees, and costs, as the jury deems appropriate and just.

Respectfully submitted,

MATTHEW GRAVES
United States Attorney

BRIAN HUDAK
Chief, Civil Division

By: /s/ *Darrell C. Valdez*
DARRELL C. VALDEZ, D.C. Bar No. 420232
Assistant United States Attorney
Civil Division, Patrick Henry Building
601 D Street, N.W.
Washington, D.C. 20530
Telephone (202) 252-2507
Darrell.Valdez@usdoj.gov

*Counsel for the United States of America*